**TESORO ALASKA PETROLEUM COMPANY, Appellant,**

v.

**KENAI PIPE LINE COMPANY and State of Alaska, Alaska Public Utilities Commission, Appellees.**

**KENAI PIPE LINE COMPANY, Appellant,**

v.

**STATE of Alaska, ALASKA PUBLIC UTILITIES COMMISSION, and Tesoro Alaska Petroleum Company, Appellees.**

**STATE of Alaska, ALASKA PUBLIC UTILITIES COMMISSION, Appellant,**

v.

**KENAI PIPE LINE COMPANY and Tesoro Alaska Petroleum Company, Appellees.**

**Nos. S–1769, S–1798 and S–1799.**

Supreme Court of Alaska.

Dec. 4, 1987.

Andrew E. Hoge, David S. Johnson, Hoge and Lekisch, Anchorage, for Kenai Pipe Line Co.

Robin O. Brena, Atkinson, Conway & Gagnon, Anchorage, for Tesoro Alaska Petroleum Co.

Virginia A. Rusch, Asst. Atty. Gen., Anchorage, Grace Berg Schaible, Atty. Gen., Juneau, for Alaska Public Utilities Commission.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This case concerns the regulatory authority of the Alaska Public Utilities Commission (APUC) under the Pipeline Act, AS 42.06.140–.640. In short, we must determine whether the APUC has jurisdiction to regulate the transportation of crude and refined oil through Kenai Pipe Line Company's (KPL) marine terminal facilities. The APUC concluded that it had jurisdiction over all movements of oil, crude and refined. The superior court affirmed the APUC's decision as to the movement of crude oil, but reversed as to the movement of refined oil, holding that "refined oil"

was not "oil" within the meaning of the Pipeline Act. Both the APUC and Tesoro Alaska Petroleum Company (Tesoro) appeal from that portion of the superior court's order which held that the APUC did not have regulatory authority over KPL's refined oil transport operations.[1] KPL cross-appeals, challenging the portion of the superior court's order holding that the APUC had regulatory authority over crude oil transport at KPL's marine terminal facility. KPL also contests the superior court's award of costs and attorney's fees to Tesoro. We conclude that the APUC has jurisdiction to regulate all aspects of KPL's operations. Accordingly, we reinstate the APUC's determination.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Statement of Facts

The relevant facts are largely undisputed.[2] For purposes of convenience, the operative facts for all three appeals will be set forth together.

KPL is involved in the transportation of crude and refined oil on the Kenai Peninsula. It performs this function through two divisions: a crude oil pipeline division and a marine terminal division. The headquarters of both divisions is Nikiski, Alaska. At the heart of the present dispute is the movement of oil through KPL's Nikiski facilities. Thus, a detailed description of these facilities and the movement of oil through them is necessary.

KPL's pipeline division consists of two main trunk lines and a receiving tank (T–401). The trunk lines carry crude oil to Nikiski from two Cook Inlet production areas, the Middle Ground Shoals production unit, and the Swanson River and Soldotna Creek production units (East Side Production Units). At Nikiski, the crude oil is (or has been) supplied to two separate refineries (Refineries): one owned and operated by Tesoro, and the other by Chevron USA, Inc. (Chevron). The crude oil is transport-

---

1. Although APUC and Tesoro have each filed a separate appeal, both raise exactly the same issues. Accordingly, we will treat the appeals together.

2. The parties approved a detailed stipulation of facts for the proceedings before the APUC.

ed from the East Side Production Units to the Refineries through the interconnection of KPL's pipeline and storage tank with "feeder" pipelines owned by the Refineries. There is no dispute concerning APUC's jurisdiction over these facilities.

KPL also owns and operates a marine terminal. This facility consists of a wharf, four storage tanks (T–402, T–405, T–407 and T–408), several hundred lineal feet of crude oil lines, a ballast system, a pump station, meters and an office/shop building. These tanks and facilities are also interconnected with the feeder pipelines that run to the Refineries. The APUC's regulation of this marine terminal facility is at issue in these appeals.

Tank T–401 of KPL's pipeline division is interconnected with the tanks and lines of KPL's marine terminal. Thus, KPL has the physical facilities and ability to transfer East Side Production Unit oil from tank T–401 to its marine terminal. KPL can also transfer this oil directly from its main trunk lines to the marine terminal facilities without passing through tank T–401. Presently, however, these interconnections are not used and have not been since 1975.

The movement of oil at KPL's marine terminal can be broken down into three categories: (1) the outward movement of crude oil, (2) the inward movement of crude oil, and (3) the outward movement of refined oil. Each of these movements is more particularly described below.

### 1. The Outward Movement of Crude Oil

The first movement of oil at issue here involves the outward movement of crude oil originating from the East Side Production Units. In the past, East Side crude oil was transported through KPL's main trunk lines and marine terminal facilities to oil tankers at KPL's wharf. The tankers would then carry the crude oil to other locations for refining.[3] KPL's entire pipeline system was originally constructed to operate in this manner.[4] In recent years, however, production from the East Side Production Units has decreased while the operations of the Refineries has increased. Consequently, less and less East Side crude oil has been shipped through KPL's marine terminal. In fact, since 1975, the Refineries have processed all the East Side crude oil; none of it has passed through KPL's marine terminal facilities. At the present time, all crude oil from the East Side Production Units is transported to the Tesoro refinery.

### 2. The Inward Movement of Crude Oil

KPL's marine terminal facility is also used to receive crude oil from tankers for transportation to the Refineries. The bulk of this oil is Alaska North Slope (ANS) crude oil from the Valdez terminal of the Trans–Alaska Pipeline System. However, Tesoro also receives some crude oil from production fields on the west side of Cook Inlet, and occasionally from foreign sources.

The ANS crude oil is off-loaded from tankers at KPL's marine terminal, transported via the facility's pump station to the storage tanks (tanks T–402, T–405, T–407, and T–408), and withdrawn as, needed by the Refineries. The crude oil from other sources is transferred to the Tesoro refinery via a line owned by Chevron which runs over KPL's marine terminal and connects with a line owned by Tesoro.

### 3. The Outward Movement of Refined Oil

The third movement of oil involves the outward transportation of "clean" and "re-

---

3. The parties' stipulation of facts states only that this oil was transported to "other locations" without further specification. The APUC's written decision also points out that "[t]he destinations of those past shipments by tanker were not specified by the parties." For purposes of its decision, however, the APUC assumed the past shipments were exclusively to destinations outside Alaska.

4. KPL's original facilities were built in 1960 and consisted of the Soldotna Creek pipeline and the Nikiski terminal (made up of a wharf, two storage tanks and a ballast system). Chevron's refinery was built in 1962 and Tesoro's in 1969. KPL added the Middle Ground Shoals pipeline in 1965, and other storage and pumping equipment was added as production increased.

sidual" refined oil[5] from the Refineries through KPL's marine terminal facilities to tankers or barges. None of these movements involves any pipeline owned by KPL.

Clean refined oil is transported from the Refineries through KPL's marine terminal via two 14-inch "clean product lines" which are owned by Chevron and connected to Tesoro's refinery.[6] Residual refined oil can be transported over KPL's property and onto its dock by way of a "resid/crude line." Currently, Chevron ships residual refined oil through KPL's marine terminal via the 20-inch resid/crude line connected to its refinery. Prior to 1982, Tesoro also transported residual refined oil over KPL's facilities via the same line owned jointly by Chevron and Tesoro. However, Tesoro has not shipped residual refined oil over KPL's facilities since November 1982, and currently moves its "resid" across the nearby unregulated Phillips Petroleum Company (Phillips) dock.

KPL charges shippers a service fee for loading refined products at its marine terminal. This untariffed fee[7] covers the attendant, direct, and administrative services performed in loading tankers and barges.

B. *Current Tariffs Regulating KPL's Marine Terminal Facility*

Prior to 1972, pipelines and pipeline facilities such as KPL's were not regulated by the state. In 1972, however, the Alaska Legislature passed the Alaska Pipeline Commission Act, ch. 139, § 1, SLA 1972, codified at AS 42.06. This act created the

Alaska Pipeline Commission[8] and granted it broad authority to regulate pipelines and pipeline carriers in Alaska to the extent not preempted by federal law. AS 42.06.-140-.150.

Among other things, this Act requires that the services offered by pipeline carriers be governed by tariffs, which must be just, reasonable, and nondiscriminatory. AS 42.06.360-.380.

To comply with these statutory mandates, KPL filed tariffs establishing rates and rules for the intrastate services it offered. At the beginning of this proceeding, KPL had in force two tariffs governing services provided at its marine terminal facility. The tariff referred to as APC No. 5 establishes rates and regulations for the transportation of crude oil from the East Side Production Units to "pipelines of others" or to "ships' rails" at KPL's marine terminal. This tariff sets different rates depending on the origin and destination of the crude oil. APC No. 5 was approved by the Alaska Pipeline Commission on November 27, 1978, effective as of July 1, 1978.

The second tariff in force is APC No. 3. Under this tariff, KPL receives crude petroleum from tankers at its marine terminal, stores it, and delivers it to "pipelines of others" at Nikiski. The charge for this service is provided in the tariff. APC No. 3 has been in effect since August 15, 1975.

It is KPL's attempt to revise these tariffs which underlies the current dispute.

5. Refined oil (or refined products) includes "clean" and "residual" products derived from crude oil. "Clean" (or "light") products are extracted from crude oil by processing and consist of gasoline, two types of jet fuel, and diesel fuel. "Residual" (also referred to as "resid" or "black") products consist of fuel oil and asphalt charge stock, the heavy residue that remains after the "clean" products are extracted.

6. Chevron is by far the major transporter of "clean" refined oil over KPL's facilities. As of September 1983, Chevron shipped approximately 5,000 to 6,000 barrels per day (BPD), and Tesoro only 510 BPD. The discrepancy in volume is due to the fact that most of the refined oil produced at Tesoro's refinery is transported directly to Anchorage through a pipeline owned

by Tesoro's subsidiary, Tesoro Alaska Pipeline Company. This pipeline is regulated by the APUC. Tesoro also transports a portion of its "clean" refined oil through the nearby Rig Tenders dock, a privately owned, unregulated facility.

7. As part of the proceedings below, the Commission ordered that this fee be tariffed. KPL has complied, reserving its rights pending this appeal.

8. In 1981, the Alaska Pipeline Commission was abolished and its function transferred to the APUC, ch. 110, § 20, SLA 1981, and the Alaska Pipeline Commission Act was renamed the Pipeline Act, ch. 110, § 16, SLA 1981, codified at AS 42.06.640.

### C. *Proceedings Below*

The present controversy began over five years ago when KPL, by letter dated August 11, 1982 and designated "Tariff Advice Letter No. 3," attempted to cancel its existing tariffs concerning the movement of crude oil through its marine terminal facility. KPL premised its tariff revisions on the assertion that the APUC lacked jurisdiction to regulate KPL's marine terminal facility because the facility (1) is not a "pipeline" or "pipeline facility" under the Pipeline Act, (2) is independent of KPL's other pipeline facilities, and (3) is not currently being used to' transport crude oil from "point to point."

With its letter, KPL filed revised tariff documents which in pertinent part can be summarized as follows:

(1) Supplement No. 1 to APC No. 3 would cancel APC No. 3, leaving no tariff in effect for receiving crude oil from marine tankers, storing it and delivering it to the pipelines of others at Nikiski.
(2) APUC No. 6 would cancel APC No. 5 and provide somewhat different rules and regulations for receiving crude oil from East Side Production Units for transport to the "pipelines of others" at Nikiski.
(3) APUC No. 7 would also cancel APC No. 5, and specifically deletes any rate for transporting crude oil from East Side Production Units to "ships' rail" at the Nikiski marine terminal.

In October, 1982, the APUC suspended KPL's proposed tariff revisions pending further proceedings.[9] Over the course of the next six months, various orders, stipulations and memoranda were issued and filed, eventually resulting in an APUC staff recommendation that the APUC approve KPL's proposed tariff revisions.

Before the APUC acted on its staff's recommendations, Tesoro petitioned the APUC for leave to intervene in the proceedings for the purpose of arguing the issue of APUC's jurisdiction. Tesoro was allowed such intervention, and briefing was

ordered. After extensive briefing by the parties, the APUC issued a bench order announcing its decision in May, 1984. A full explanation of the APUC's reasoning followed in "Order No. 9," issued December 3, 1984. In this order, the APUC concluded:

[KPL's] activities which involve transportation through its Nikiski marine terminal and dock facilities are subject to jurisdiction by the Commission under AS 42.06 unless preempted by federal jurisdiction.

Accordingly, the APUC rejected KPL's tariff revisions, which would have had the effect of removing KPL's marine terminal facility from APUC regulation, and ordered KPL to file an additional tariff establishing rates for the services it provides in transporting refined products. Specifically, the APUC found:

1. In the event there are outward intrastate movements of crude oil over the KPL dock, the Commission has jurisdiction over those movements.
2. Since it is unlikely that outward intrastate movements of crude oil will occur in the future, KPL is not required to have an intrastate tariff rate for that service on file with the Commission. However, KPL is required to note the availability of this service in its tariff.
3. KPL should be required, however, to provide such intrastate service in the event a request for such service is made.
4. The Commission has jurisdiction over inward intrastate movements of crude oil over the KPL dock.
5. Inward intrastate movements of crude oil over the KPL dock are presently occurring.
6. KPL is required to maintain an intrastate tariff rate for inward intrastate movements of crude oil on file with the Commission.
7. There are presently outward intrastate movements of petroleum products over the KPL dock.

---

**9.** Under AS 42.06.390, revised tariffs automatically take effect after 30 days' notice to the APUC and the public unless suspended pending

a hearing as to their reasonableness and propriety pursuant to AS 42.06.400.

8. KPL performs services in connection with those outward intrastate movements of petroleum products.

9. KPL is required to maintain an intrastate tariff rate for its services in connection with outward intrastate movements of petroleum products over its dock facility.

In reaching the above conclusions, the APUC separately discussed the basis for jurisdiction over each of the three "movements" of oil involving KPL's marine terminal. With regard to the outward movement of crude oil, the APUC rejected KPL's argument that the statutory definition of pipeline did not include the marine terminal facility, and concluded that it had jurisdiction over any intrastate movements of crude oil. The APUC noted that, in the past, KPL had recognized its common carrier obligation to accept intrastate shipments of crude oil without discrimination by continuously maintaining an intrastate tariff, and that KPL had not followed the required procedure or established the justification for abandonment.

The APUC's conclusion that KPL's marine terminal facility is within the statutory definition of "pipeline" or "pipeline facility" also settled the question of jurisdiction over the inward movement of crude oil. It rejected KPL's claim that the "point to point" transportation of oil referred to in the statutory definitions means transportation originating at the wellhead. In so doing, the APUC emphasized that KPL was not free to terminate its established common carrier obligation at will.

Finally, with respect to the movement of refined oil, the APUC rejected KPL's arguments that the commission lacks jurisdiction over the shipment of refined oil by pipeline absent a right-of-way lease executed under AS 38.35. The APUC simply concluded that "[t]he definition of oil in AS 42.06.630(7) plainly includes all oil products, whether refined or naturally occurring."

KPL petitioned for reconsideration of the APUC's order. This request was denied as a matter of law pursuant to 3 AAC 48.105 (eff. 1/13/73; am. 6/29/84).

In March, 1985, KPL appealed the APUC's decision to the superior court, arguing that the APUC's order was discriminatory, clearly erroneous, and constituted an abuse of discretion. KPL further argued that APUC regulation of its marine terminal facility constituted an unlawful taking and violated due process, equal protection, and the Alaska Administrative Procedure Act.

After briefing and oral argument, the superior court, Judge Michael White, *pro tem*, presiding, entered its Decision on Appeal on July 30, 1986. Applying an "independent judgment" standard of review, the superior court upheld the APUC's jurisdiction over the outward and inward movement of crude oil at KPL's marine terminal. However, the court reversed the APUC's decision that it had regulatory authority over the services KPL provides for the movement of refined oil, reasoning that refined oil is not "oil" as defined in AS 42.06.630(7).[10]

Tesoro, claiming to be the "prevailing party," moved for an award of costs and attorney's fees. KPL opposed, and simultaneously moved that it be awarded attorney's fees. Subsequently, superior court judge Peter Michalski entered an order awarding Tesoro $675.37 in costs and $10,922.80 in attorney's fees, and entered a final judgment for that amount. These appeals followed.

## THE APPROPRIATE STANDARD OF REVIEW

Initially, we must determine the appropriate standard of review in this case. Tesoro argues that we should apply a "reasonable basis" standard because the issues raised in these cases involve agency expertise and fundamental policy considerations in an area where the administrative agency has been granted broad regulatory authority. KPL and the APUC, meanwhile, contend that this case involves questions of pure statutory construction within the special competency of the courts, and there-

---

10. The court did not address KPL's constitutional arguments.

fore an "independent judgment" standard of review is appropriate.

■ At the outset, we note that when the superior court acts as an intermediate court of appeal, no deference is given to the lower court's decision. *Amerada Hess Pipeline Corp. v. Alaska Public Utilities Comm'n,* 711 P.2d 1170, 1175 (Alaska 1986); *National Bank of Alaska v. State, Department of Revenue,* 642 P.2d 811, 816 (Alaska 1982); *State v. Lundgren Pacific Construction,* 603 P.2d 889, 892 (Alaska 1979). Instead, we independently scrutinize directly the merits of the administrative determination. *State, Alcoholic Beverage Control Board v. Decker,* 700 P.2d 483, 484 n. 4 (Alaska 1985); *Union Oil of California v. Department of Revenue,* 560 P.2d 21, 23 n. 5 (Alaska 1977); *Jager v. State,* 537 P.2d 1100, 1106 (Alaska 1975).

We have articulated two standards under which this court will review agency interpretation of statutory terms (i.e., questions of law). One is the rational basis standard, under which we defer to the agency's determination so long as it is reasonable. *E.g., National Bank of Alaska,* 642 P.2d at 815. The other is the independent judgment standard under which the court makes its own interpretation of the statute involved. *Id.*

■ The rational basis test is used where the questions at issue implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function. *See, e.g., Matanuska–Susitna Borough v. Hammond,* 726 P.2d 166, 175–77 (Alaska 1986) (agency's interpretation of "population" for state revenue-sharing and tax limitation purposes).[11] It is generally applied in two circumstances:

> First, ... where the agency is making law by creating standards to be used in evaluating the case before it and future

cases. Second, ... when a case requires resolution of policy questions which lie within the agency's area of expertise and are inseparable from the facts underlying the agency's decision.

*Earth Resources v. State, Department of Revenue,* 665 P.2d 960, 964 (Alaska 1983) (citations omitted). When applying the rational basis test, we merely seek to determine whether the agency's decision is supported by the facts and has a reasonable basis in law, even if we may not agree with the agency's ultimate determination. *E.g., Kelly v. Zamarello,* 486 P.2d 906, 918 (Alaska 1971). *See generally* cases cited *supra* note 11.

■ The substitution of judgment standard is applied where the questions of law presented *do not* involve agency expertise or where the agency's specialized knowledge and experience would not be particularly probative as to the meaning of the statute. *E.g., Matanuska–Susitna Borough,* 726 P.2d at 175; *Glacier State Telephone v. Alaska Public Utilities Comm'n,* 724 P.2d 1187, 1189 n. 1 (Alaska 1986). As we recently observed in *Earth Resources:*

> The standard is appropriate where the knowledge and experience of the agency is of little guidance to the court *or* where the case concerns "statutory interpretation or other analysis of legal relationships about which the courts have specialized knowledge and experience."

665 P.2d at 965 (emphasis added) (quoting *Kelly,* 486 P.2d at 916). Application of this standard permits a reviewing court to substitute its own judgment for that of the agency even if the agency's decision had a reasonable basis in law. *Id.*

■ The issues in this case all revolve around questions of statutory interpretation requiring the application and analysis of various canons of statutory construc-

11. *See also Beers, Inc. v. Robison,* 708 P.2d 65, 68–69 (Alaska 1985) (agency interpretation of definition of electrical "distribution systems"); *Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 161 (Alaska 1982) (agency determination of "hardship condition" for calculating entitlement to limited entry permit); *Hammond v. North Slope Borough,* 645 P.2d 750, 758 (Alaska 1982) (agency determination of "public interest" for offshore oil and gas leases); *Jager,* 537 P.2d at 1106–07 (agency determination regarding initiation of rate investigation); *Mobil Oil Corp. v. Local Boundary Comm'n,* 518 P.2d 92, 97–98 (Alaska 1974) (agency decision to authorize incorporation of North Slope Borough).

tion. This type of question is regular grist for judicial mills.[12] As we have previously stated:

> where, as here, the issues to be resolved turn on statutory interpretation, the knowledge and expertise of the agency is not conclusive of the intent of the legislature in passing a statute. Statutory interpretation is within the scope of the court's special competency, and it is our duty to consider the statute independently.

*Union Oil of California*, 560 P.2d at 23 (footnote omitted).

Because this case involves statutory interpretation, we conclude that the independent judgment test is the appropriate standard of review. Accordingly, we need not defer to the interpretation of the APUC, but must independently consider the meaning of the statutes involved. With this in mind, we turn to the merits of these appeals.

### DISCUSSION

#### A. *Tesoro's and APUC's Appeals*

 The APUC determined, in relevant part, that "[t]he definition of oil in AS 42.06.630(7) plainly includes *all oil products, whether refined or naturally occurring.*" (emphasis added). Based on this determination, the APUC concluded that it had regulatory authority under the Pipeline Act over "any service that [KPL] performs in connection with intrastate shipments of crude oil or petroleum products." Thus, the issue we must resolve is whether the APUC was correct in its conclusion that refined oil is within the definition of oil contained in AS 42.06.630(7).

Our starting point in this inquiry is the language of the statute itself construed in light of the purposes for which it was enacted. *Commercial Fisheries Entry Comm'n v. Apokedak*, 680 P.2d 486, 489–90 (Alaska 1984). Alaska Statute 42.06.630(7) defines oil for the purposes of the Pipeline Act:

> *"oil" includes crude oil,* and other hydrocarbons regardless of gravity which are produced at the wellhead in liquid form, *its products and liquid hydrocarbons,* including the liquid hydrocarbons known as distillate or condensate recovered or extracted from gas, other than gas produced in association with oil and commonly known as casinghead gas[.]

(Emphasis added).

Common rules of grammar lead to the conclusion that the term "its products" refers back to the antecedent "crude oil" despite the intervening language. Thus, oil, as defined by AS 42.06.630(7), includes crude oil and crude oil products. The main dispute is whether the phrase "its products" in the definition includes refined oil.

Tesoro and the APUC argue that it does. They contend that the plain language of AS 42.06.630(7) and a comparison of this statute with contemporaneous legislation show that refined petroleum products were intended to be included in the definition of oil. They rely on a number of canons of statutory interpretation to bolster their position.

KPL, meanwhile, argues that the definition of oil in AS 42.06.630(7) includes only those oil products which originate naturally at the wellhead. KPL asserts that the definitions of oil and products under the Right-of-Way Leasing Act, AS 38.35, evi-

---

**12.** We have repeatedly stated that "we consider the matter of statutory construction particularly within the special competency of this court." *Earth Resources*, 665 P.2d at 965 n. 8. *See also Amerada Hess Pipeline Corp. v. Alaska Public Utilities Comm'n*, 711 P.2d 1170, 1176 n. 5 (Alaska 1986); *Weaver Bros., Inc. v. Alaska Transp. Comm'n*, 588 P.2d 819, 821 (Alaska 1978); *State v. Aleut Corp.*, 541 P.2d 730, 736 & n. 15 (Alaska 1975); *Mukluk Freight Lines v. Nabors Alaska Drilling*, 516 P.2d 408, 411–12 (Alaska 1973). The other cases in which we have applied the independent judgment standard of review also involve issues of statutory interpretation. *See Sea–Land Services v. State, Second Injury Fund*, 737 P.2d 793, 795 (Alaska 1987); *National Bank of Alaska*, 642 P.2d at 816; *Hood v. State, Workmen's Compensation Board*, 574 P.2d 811, 813 (Alaska 1978); *Union Oil of California*, 560 P.2d at 23–24; *Cook v. Alaska Workmen's Compensation Board*, 476 P.2d 29, 32 (Alaska 1970); *Aleutian Homes v. Fischer*, 418 P.2d 769, 776–77 (Alaska 1966); *Northern Corp. v. Saari*, 409 P.2d 845, 846 (Alaska 1966).

dence the legislature's intention to exclude refined oil from the definition of oil under the Pipeline Act.[13] KPL further contends that when read as a cohesive whole, the definition of oil under the Pipeline Act excludes refined oil. We cannot accept KPL's interpretation.

■ The goal of statutory construction is to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others. *State v. Alex,* 646 P.2d 203, 208 & n. 4 (Alaska 1982). In this respect, we have repeatedly stated that unless words have acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in accordance with their common usage. *Division of Elections v. Johnstone,* 669 P.2d 537, 539 (Alaska 1983), *cert. denied,* 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984); *Wilson v. Municipality of Anchorage,* 669 P.2d 569, 571–72 (Alaska 1983); *State, Department of Revenue v. Debenham Electric Supply,* 612 P.2d 1001, 1002 (Alaska 1980). *See also* AS 01.10.040.[14] The term "its products" is not defined by the Pipeline Act, nor have we had occasion to examine its meaning. Thus, the plain or common meaning of products as it relates to oil is controlling.

In common usage the products of crude oil would certainly seem to include refined oil. If asked to name a product of crude oil, a reasonable person would surely think of refined products. Indeed, such an individual would likely be at a loss to name a product of crude oil "occurring naturally at the wellhead," which is KPL's strained interpretation.

In addition, the technical definition used in the oil industry of the phrase "its products," in reference to the word oil, generally includes refined oil. *See* H. Guthrie, *Petroleum Products Handbook* (1960) (discussing at length crude oil products including gasoline, diesel fuels, heating oils, and other types of refined oil); H. Williams & C. Meyers, *Oil & Gas Terms: Annotated Manual of Legal Engineering Tax Words & Phrases* 305 (1964) (defining product to include refined oil). Moreover, it is unusual for a technical definition of oil to include the word "product" when referring only to crude oil. *See* R. Langenkamp, *Handbook of Oil Terms and Phrases* 89 (1974); Williams & Meyers, *supra,* at 259.

The legislative development of the definition of oil also supports the position that "products" was intended to include refined oil. As originally enacted in 1972, the definition of oil in AS 42.06.630(7) clearly did not include refined oil. That original definition read:

> "Oil" means crude petroleum oil in its natural state and crude petroleum oil from which only basic sediment and water have been removed.

Ch. 139, § 1(8), SLA 1972. In 1973, the legislature amended the definition to its current status. Of particular significance is the setting in which this amendment occurred.

In 1973, a special session of the legislature was convened to deal with numerous oil and pipeline-related measures. Eight acts were passed at this special session, four of which contained a definition of oil. In two of the acts, the word oil was defined as follows:

> "oil" includes crude petroleum oil and other hydrocarbons regardless of gravity which are produced at the wellhead in liquid form and the liquid hydrocarbons known as distillate or condensate recovered or extracted from gas, other than gas produced in association with oil and commonly known as casinghead gas[.]

Am. to Right-of-Way Leasing Act, ch. 3, § 22(6), FSSLA 1973 (now codified at AS 38.35.230(6)); Common Purchaser Act, ch. 7, § 1, FSSLA 1973 (now codified at AS 31.15.050(3)). In a third act, the very same

---

**13.** Alaska Statute 38.35.230(8) contains a very expansive definition of "product."

**14.** AS 01.10.040 provides:
Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage. Technical words and phrases and those which have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, shall be construed according to the peculiar and appropriate meaning.

definition was given for the term unrefined oil. Oil and Gas Exploration, Production and Pipeline Transportation Property Taxes Act, ch. 1, § 1, FSSLA 1973 (now codified at AS 43.56.210(8)). Only in the fourth act, the amendments to the Pipeline Act, ch. 6, § 8, FSSLA 1973, is the word oil defined differently. In this act, *see supra* p. 904, additional punctuation is present and the words *"its products and liquid hydrocarbons, including"* are inserted into the definition. AS 42.06.630(7) (emphasis added).

This difference in language must have some significance, for "[t]here is a presumption that every word, sentence, or provision was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used." *Alaska Transportation Comm'n v. Airpac, Inc.*, 685 P.2d 1248, 1253 (Alaska 1984) (quoting 82 C.J.S. *Statutes* § 316 (1953)). *See also City of Homer v. Gangl*, 650 P.2d 396, 399 (Alaska 1982) (presumption that legislature has not used superfluous words); *City and Borough of Juneau v. Thibodeau*, 595 P.2d 626, 634 (Alaska 1979). If the term "its products" is construed to mean only the "products" of crude oil occurring naturally at the wellhead, the term is rendered superfluous.

■ Additionally, we agree with Tesoro's and the APUC's argument that the Pipeline Act and the Right-of-Way Leasing Act should be read together. Both statutes were adopted as part of a comprehensive package of legislation designed to deal with the impact on the state of the Trans-Alaska Pipeline System. They were companion acts designed to delegate to the APUC the necessary authority to regulate pipeline carriers, pipelines and pipeline facilities. They were presented and considered jointly by the legislature. The Right-of-Way Leasing Act specifically sets out what it intended by the use of the word "product:"

"product" means refined crude oil, crude tops, topped crude, processed crude pe-

troleum, residue from crude petroleum, cracking stock, uncracked fuel oil, fuel oil, treated crude oil, residuum, gas oil, casinghead gasoline, natural gas gasoline, naphtha, distillate, gasoline, kerosene, benzine, wash oil, waste oil, blended gasoline, lubricating oil, blends or mixtures of petroleum and any liquid product or by-product derived from crude petroleum oil or natural gas[.]

AS 38.35.230(8). "When the legislature uses the same term in two closely related statutes, we will normally presume that the legislature intended that term to mean the same thing in both cases." *Matanuska-Susitna Borough v. Hammond*, 726 P.2d 166, 180 (Alaska 1986). Applying this presumption here, we conclude that the legislature intended the phrase "its products" to include refined oil.

Finally, KPL's arguments require highly strained technical interpretations of words and phrases out of place with our duty to interpret regulatory statutes liberally. *Anchorage v. Locker*, 723 P.2d 1261, 1263 (Alaska 1986). We conclude that the term "its products" was intended to include refined oil within its purview, and that "oil," as defined by AS 42.06.630(7), includes refined oil. Given this conclusion, it naturally follows that the APUC has regulatory authority over the refined oil services KPL provides at its marine terminal facility. Thus, the APUC's decision is upheld.

### B. *KPL's Cross–Appeal*

■ The APUC held that it had jurisdiction over the outward and inward movement of crude oil at KPL's marine terminal facility, and the superior court upheld that determination. KPL raises a myriad of arguments in its appeal of that aspect of the superior court decision.[15] Only two of its arguments merit discussion: whether the APUC erred by holding that it had jurisdiction over the *outward* movement of crude oil, and whether it erred in holding that it had jurisdiction over the *inward* movement of crude oil.

**15.** KPL listed 17 points on appeal and specifies 16 issues presented for review in its brief.

■ KPL argues that the APUC does not have jurisdiction over its marine terminal for the purposes of the outward movement of crude oil because the facility is not a "pipeline facility" within the meaning of AS 42.06.630(8).[16] It argues that the marine terminal is not a "total system of pipe" or an "integral line of pipe," and that it does not include facilities which are "used or necessary" for an integral line of pipe to effectuate transportation. If KPL's marine terminal is not considered a pipeline facility for purposes of the outward movement of crude oil, then the APUC has no jurisdiction over it.

We find little merit in KPL's argument. The interpretation of AS 42.06.630(8) that KPL suggests is hypertechnical and inconsistent with common sense. First, the KPL marine terminal facility is physically connected to the remainder of its pipeline system. It is significant that prior to 1975 the marine terminal facility could correctly be described as part of a "total system of pipe," (as KPL admitted in its trial brief) and therefore a "pipeline facility." KPL cannot be permitted to eradicate the APUC's jurisdiction over it simply by making an operational decision to change the function of one of its facilities. Moreover, it is clear that the marine terminal facility as it exists today is a "total system of pipe" as that term was undoubtedly intended by the legislature: the facility has four storage tanks, several hundred feet of oil lines, a ballast system, a pump station, meters, and an office building. KPL's marine terminal facility logically is within the definition of "pipeline facility" in AS 42.06.-630(8) for the outward movement of crude oil, and thus is subject to the APUC's regulatory authority.

■ As for the APUC's jurisdiction over the inward movements of crude oil, we also find KPL's arguments unpersuasive. It contends that these inward movements do not involve "transportation" as that term is used in AS 42.06.630(8), and therefore the APUC lacks statutory authority to assert jurisdiction.

Again, KPL's statutory interpretation strains logic. There is absolutely no indication either in the statute itself, the legislative history, or the practice of the APUC to support KPL's contention that, for the "transportation" of the oil "from point to point" to fall within the statute, one of the "points" must be a wellhead. The parties have stipulated to the fact that incoming crude oil is "transported" from the tanker docked at the KPL wharf, through the marine terminal lines, to the terminal storage tanks. A plain reading of the statute mandates our conclusion that the inward movements of crude oil do qualify as "transportation from point to point," and thus we hold that the APUC does have jurisdiction over the inward movement of crude oil at the KPL facility.[17]

The balance of KPL's arguments are meritless. We can find no equal protection or due process violation in the APUC's regulation of the KPL marine terminal facility. Finally, we find no abuse of discretion by the superior court in its award of attorney's fees and costs to Tesoro. Our disposition in this case leaves Tesoro the prevailing party on every issue appealed, and thus clearly entitled to attorney's fees. As those costs and fees awarded were not manifestly unreasonable, we find no basis for reversing the superior court's ruling on

---

16. AS 42.06.630(8) provides:
 "Pipeline" or "pipeline facility" means all the facilities of a total system of pipe (whether owned or operated by a pipeline carrier under a contract, agreement, or lease) in this state used by a pipeline carrier for transportation, for hire and as a common carrier, of oil, gas, coal or other mineral slurry for delivery, storage, or further transportation, and including all pipe, pump and compressor stations, station equipment, and all other facilities used or necessary for an integral line of pipe to effectuate the transportation from point to point,

excluding, however, gas processing plants, treaters and separators[.]

17. Given our holding that both the outward and inward movements of crude are subject to APUC regulation under the statute, KPL's only remaining avenue to pursue is the abandonment procedure outlined in AS 42.06.290(a). That statute describes the only way a pipeline carrier can relinquish the use of its pipeline and thereby avoid further APUC regulation. The APUC can only grant abandonment with notice and a hearing. AS 42.06.290(a).

this issue. *See City of Yakutat v. Ryman,* 654 P.2d 785, 793 (Alaska 1982).

## CONCLUSION

We agree with the decision of the APUC, and hold that the APUC has jurisdiction to regulate all movements of crude and refined oil through KPL's marine terminal facility. Accordingly, we AFFIRM that part of the superior court's order which upheld the APUC's jurisdiction over crude oil, and REVERSE that part which determined that the APUC does not have jurisdiction over refined oil.