*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JEFFREY WEST and BONNIE WEST,<br><br>              Appellants,<br><br>v.<br><br>ALASKA MENTAL HEALTH TRUST AUTHORITY; STATE OF ALASKA, DEPARTMENT OF NATURAL RESOURCES, TRUST LAND OFFICE; LOUIS OLIVA; and STACY OLIVA,<br><br>              Appellees. | Supreme Court No. S-17407<br><br>Superior Court No. 3KN-18-00087 CI<br><br>O P I N I O N<br><br>No. 7468 – July 24, 2020 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Lance Joanis, Judge.

Appearances: Hilary D. Stump and Carl Bauman, Gilman & Pevehouse, Kenai, for Appellants. Colleen J. Moore, Senior Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellees Alaska Mental Health Trust Authority and State of Alaska, Department of Natural Resources, Trust Land Office. Robert J. Molloy and Kristine A. Schmidt, Molloy Schmidt LLC, Kenai, for Appellees Louis Oliva and Stacy Oliva.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

STOWERS, Justice.

## I. INTRODUCTION

In October 2017 the Trust Land Office (Land Office) issued a best interest decision in favor of selling five lots of land owned by the Alaska Mental Health Trust (Trust) to Louis and Stacy Oliva. Oliva's neighbors, Jeffrey and Bonnie West, submitted late comments opposing the sale. The Land Office accepted those comments as a request for reconsideration, but it ultimately denied West's request and proceeded with the sale. West appealed to the superior court, which affirmed the best interest decision. On appeal West argues that the sale was not in the Trust's best interest, the Land Office violated a number of statutes and regulations, and the agency's public notice regulation is invalid. We conclude that West's first argument lacks merit and the remaining issues have been waived for various reasons; we therefore affirm the best interest decision.

## II. FACTS AND PROCEEDINGS

### A. The Land Office And Background Facts

The Alaska Mental Health Trust Authority (Trust Authority) was created in 1991 to act as trustee for the lands granted to Alaska by the federal government in 1956 through the Alaska Mental Health Enabling Act.[1] The Department of Natural Resources (DNR) was tasked with the actual management of Trust lands, and it created the Land Office as a special unit to handle that duty.[2] Prior to any decision involving the sale of Trust lands, the Land Office is required by regulation to consult with the Trust

---

[1] *See* AS 37.14.001; AS 47.30.011. *See generally* ch. 66, SLA 1991 (establishing Trust Authority); *Weiss v. State* (*Weiss II*), 939 P.2d 380, 382-85 (Alaska 1997) (detailing events prior to Trust Authority's creation).

[2] *See* AS 44.37.050(a) ("To carry out its duties under AS 38.05.801, the Department of Natural Resources shall establish a separate unit with responsibility for management of the mental health trust land."); 11 Alaska Administrative Code (AAC) § 99.010 (2018) (describing Land Office's duties and authority).

Authority's Resource Management Committee.[3]  The Land Office's executive director makes the final decision whether a sale is in the Trust's best interest.[4]

In a January 2017 consultation with the Resource Management Committee, the Land Office proposed to "offer up to 100 Trust properties" for sale each year from 2018 to 2020, including three of the five lots at issue in this appeal.  Those five lots — referred to as Lots 17, 22, 35, 36, and 37 — are located on Daniels Lake near Nikiski and are adjacent to Oliva's property.  Only Lot 17 has a common boundary with West's property.  Notice of sale was posted on Lots 17 and 35 in late April 2017 and the Land Office commissioned an appraisal of those two lots.  The appraiser's report noted encroachments  and overturned gas containers on Lot 17, but it assessed the properties based on the hypothetical conditions that the lots were clean and vacant.  The report valued Lot 17 at $93,000 and Lot 35 at $80,000, and recommended the lots be sold as-is for the highest return.

Oliva submitted his application in late May seeking a negotiated purchase of those two lots as well as Lots 22, 36, and 37.  In response, the Land Office commissioned another appraisal for the three additional lots, which were valued collectively at $145,000.  The appraiser did not note any encroachments or other potential issues for those lots.  Based on Oliva's offer and the appraisal reports, the Land Office again consulted with the Resource Management Committee in early August regarding the potential negotiated sale of the five lots to a "neighboring land owner."

---

[3]     *See* 11 AAC 99.030(c)-(d); *Committees*, ALASKA MENTAL HEALTH TR. AUTHORITY,   https://alaskamentalhealthtrust.org/about/governance/committees/  (last visited Apr. 8, 2020) (describing Resource Management Committee's role as "advising the [Land Office] on managing the Trust's non-cash assets including land and natural resources").

[4]     *See* 11 AAC 99.010(b), (d); 11 AAC 99.020(b).

The Land Office stated it would seek "approximately 20-30% above the appraised values" and estimated the total revenue at around $410,000. The consultation report noted several "structural encroachments" placed by Oliva on Lot 17, including a barn and a manmade pond, and reasoned that "the sale would generate revenue for the Trust while solving an ongoing trespass/encroachment issue." The Resource Management Committee approved the negotiated sale without objection.

West met with the Land Office to discuss his interest in purchasing Lots 17 and 35 in August and submitted an application to buy those two lots. West "provided a firm verbal offer of up to 30% above" the lots' appraised values "contingent upon no competition," because he was "uninterested in getting into a bidding war" with Oliva. The Land Office conducted a site visit in early September along with a DNR land surveyor. The surveyor was able to find several field monuments with a metal detector and noted that the property boundaries appearing on Alaska Mapper and the Kenai Peninsula Borough's mapping service both contained erroneous boundary lines at odds with the U.S. Bureau of Land Management's plat map. Based on the corrected boundary lines, the surveyor confirmed several structural encroachments on Lot 17, but determined that "there did not appear to be any structural trespass" on Lot 22. The surveyor's memorandum concluded by noting that "[t]he exact extent of structural or use trespass can only be determined by a complete survey performed by a professional surveyor."

West conducted his own site visit in September and then informed the Land Office that he "can no longer support [his] original offer to purchase Lot 17 as is." West suggested subdividing both lots prior to sale and again offered "appraisal value plus a 30% premium" for only the unencumbered portions of Lots 17 and 35 "to help with the cost of subdividing and to avoid a bidding war." West later suggested that he would be open to "the possibility of subdividing [the encumbered] portion off after acquiring the entire lot" in order to avoid "be[ing] eliminated from consideration." When the Land

Office asked if he was interested in purchasing any of the other parcels, West replied that his "interest remains exclusively in Lots 17 and 35."

In contrast, Oliva stated that subdivision would be unacceptable, but agreed to "pay reasonable compensation" for past use of Lot 17. In October, Oliva offered a $10,000 settlement based on three years of unauthorized use at $3,000 per year, "plus an additional $1,000." This initial offer was rejected and Oliva subsequently agreed to pay $21,000 separate from any land sale. Oliva also made an initial offer of 30% above the appraisal price on Lot 17 and 20% above for the other four lots. After some negotiation, Oliva revised his offer to 30% above the appraised value for both Lots 17 and 35, and 25% above for the remaining three lots for a total purchase price of $406,150.

**B.     The Best Interest Decision And West's Request For Reconsideration**

At the end of October 2017 the Land Office drafted its best interest decision to accept Oliva's proposal, finding it to be "in the best interest of the Trust." The decision noted that Oliva "ha[d] been using a portion of Trust land to house horses," but had "remitted $21,000 to pay in full the past unauthorized land uses." West's offer was also mentioned as an alternative option, but one that would not "resolve unauthorized use" and would result in continued accrual of management costs for the three remaining lots "as a non-performing asset." Proceeding with the sale to Oliva, on the other hand, would "alleviate the Trust from managing a non-performing asset and resolve an unauthorized use, while generating maximum revenue." The decision included an inconsistency determination listing a number of statutes that were not applied as "inconsistent with Trust management principles and inapplicable to Trust land by [agency] regulations," including the notice provisions in AS 38.05.945.[5] Notice of the

---

[5]     This statute governs certain state land sales and requires a robust public notice process, such as by publishing notice for two weeks "in newspapers of statewide
(continued...)

decision was to be provided in accordance with 11 AAC 99.050; anyone who submitted comments could subsequently file for reconsideration.

Public notice began on November 2 with the best interest decision to be posted on the Land Office's website along with courtesy copies being sent to the state website, the trustees, the municipality, and Oliva as the purchaser. The notice provided a physical mailing address as well as an email address for submitting comments and listed December 7 as the cutoff date. The Land Office also called West to inform him directly where the decision would be posted and explained that "anyone has a right to submit a written comment within that 30 days for consideration if they disagree." The Land Office formally adopted its decision on December 8, noting that "no comments were received." That same day West requested a stay in order to submit late comments, alleging that he only recently found out about the comment period and that the Land Office had previously advised him that he had no "options for recourse or comment." West stated that his challenge would focus primarily on "[u]nfair business practices" and whether the sale was in the Trust's best interest.

West submitted his written comments on December 11. West alleged a number of factual omissions from the best interest decision, including that Oliva's "house and beach development" encroached on Lot 22. West criticized the decision to sell the lots to Oliva as "encourag[ing] future encroachment by rewarding illegal behavior." West argued that he paid the $500 application fee for the privilege of being "kept in the loop," but alleged that he "never had a place at the negotiating table." Instead, the sale was "a package deal" on all five lots, and West was "never . . . given an opportunity to revise [his] bid." West did not, however, suggest that he would have

_____

[5]    (...continued)
circulation" or even directly notifying "parties known or likely to be affected by the action." AS 38.05.945(b)(3)(A), (D).

raised his offer on Lots 17 and 35 or that he would have offered to purchase more lots had he been "kept in the loop," nor did he explicitly make any increased offer in his comments. West acknowledged that the Land Office followed its regulatory requirements for public notice, but still generally "challenge[d] the ethics involved."

Rather than reject West's comments as untimely, the Land Office opted to treat them "as a request for reconsideration." Nevertheless, the Land Office denied West's request and upheld the best interest decision in its entirety. The Land Office refuted the notion that it required a block sale, but noted that Oliva was "not interested in purchasing anything less than all five parcels" while West was only interested in two. The Land Office explained that the potential alternative of subdividing Lot 17 was "ultimately abandoned . . . because it became apparent that the parties were unlikely to agree on how to subdivide the lots, and such a subdivision would have cost money, without any increase in value to the lots." And because Oliva's final offer not only matched West's offer for Lots 17 and 35 but included three more, "the [Land Office] reduced its management burden and realized an above-market gain" by selling all five to Oliva. The agency also rebutted West's allegations of any additional encroachments and argued that its success in obtaining payment for Oliva's past use "without incurring unnecessary legal expenses or risk of litigation" instead "demonstrates that the [Land Office] has and will continue to seek compensation for unauthorized use of Trust land."

## C.     Superior Court Proceedings

West appealed the best interest decision and the Land Office's denial of his request for reconsideration to the superior court. The court held oral argument in February 2019. In addition to those issues raised in his comments to the agency, West argued that the Land Office failed to abide by various state statutes or provide adequate explanation for its decision. The State countered that West had not alleged any real harm because he received both actual and constructive notice, and his late comments were

ultimately considered by the Land Office. The State also pointed out that West was not disputing the validity of any of the agency's regulations,[6] and West did not address that issue on rebuttal.

The superior court affirmed the best interest decision "in large part in agreement with the briefing by the State." Applying the "reasonable basis standard" to the Land Office's legal interpretations, the court found that West failed to "show[] how the . . . Land Office could obtain a better return for the Trust and its beneficiaries" other than through its sale to Oliva. The court noted that "the only applicable public notice requirements for the proposed sale . . . were in 11 AAC 99.050(a)," and regardless West "did receive actual notice" and was "given a full opportunity to participate." The court also briefly commented on the validity of 11 AAC 99.020(f),[7] stating only that it "is clearly consistent and necessary to implement" the Trust Authority's governing statutes. Because the agency "did consider all reasonable alternatives" and "did comply with applicable procedural requirements," the court affirmed the Land Office's best interest decision.

West now appeals.

---

[6] West argued that the Land Office should have applied AS 38.05.945 for public notice, but at no point did he suggest that 11 AAC 99.050 was an invalid agency regulation prior to this appeal. West first mentioned the issue of preemption in his reply brief before the superior court in regard to 11 AAC 99.030(e), but without reference to any specific legal authority.

[7] This subsection states: "Unless otherwise specified in this chapter, every provision of law applicable to other state land applies to the management of trust land unless its application is determined, in [a] written finding . . . , to be inconsistent, in whole or in part, with [trust management principles]." 11 AAC 99.020(f). Most of the Land Office regulations contain a similar clause. See, e.g., 11 AAC 99.030(e); 11 AAC 99.040(c); 11 AAC 99.050(b).

## III. STANDARD OF REVIEW

We review the merits of administrative decisions on appeal de novo.[8] For questions of law in administrative appeals we apply the reasonable basis standard "when the interpretation at issue implicates agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions."[9] Under that standard, we only "seek to determine whether the agency's decision is supported by the facts and has a reasonable basis in law."[10]

## IV. DISCUSSION

### A. History Of The Alaska Mental Health Trust

The issues West raises require us to revisit the history of the Alaska Mental Health Trust for the first time in over twenty years.[11] This is also the first appeal of a Land Office decision to come before us.

Congress passed the Alaska Mental Health Enabling Act (Act) in 1956 partially for the purpose of creating and implementing "an integrated mental health program" in the soon-to-be State of Alaska.[12] To effectuate this goal, the Act granted up

---

[8] *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992) (citing *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

[9] *Haar v. State, Dep't of Admin., Div. of Motor Vehicles*, 349 P.3d 173, 180 (Alaska 2015) (quoting *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011)).

[10] *Id.* at 180-81 (quoting *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014)).

[11] *See Weiss II*, 939 P.2d 380 (Alaska 1997).

[12] Pub. L. No. 84-830, § 201, 70 Stat. 709, 709 (1956).

to "one million acres from the public lands of the United States in Alaska" to the State.[13] The Act provided that those lands

> shall be administered . . . as a public trust and such proceeds and income shall first be applied to meet the necessary expenses of the mental health program of Alaska. Such lands, income, and proceeds shall be managed and utilized in such manner as the Legislature of Alaska may provide. Such lands . . . may be sold . . . or otherwise disposed of in such manner as the Legislature of Alaska may provide . . . . The authority of the Legislature of Alaska under this subsection shall be exercised in a manner compatible with the conditions and requirements imposed by other provisions of this Act.[14]

Despite this directive, the State did not maintain a separate account for Trust lands for over 20 years, and in 1978 the legislature formally redesignated those lands "as general grant land" to be managed by DNR and disposed of in accordance with applicable state law.[15] A number of individuals filed a class-action lawsuit in 1982 alleging a breach of the public trust as a result of that redesignation.[16] In *Weiss I* we held that the State was not empowered to unilaterally terminate that public trust,[17] and we remanded to the trial court for further proceedings, stating that its goal should be "to restore the trust to its position just prior to the conveyance effected by the redesignation legislation."[18]

---

[13] *Id.* § 202(a), 70 Stat. at 711.

[14] *Id.* § 202(e), 70 Stat. at 712.

[15] *State v. Weiss* (*Weiss I*), 706 P.2d 681, 682 (Alaska 1985) (quoting ch. 181, § 3(a), SLA 1978).

[16] *Id.* at 682.

[17] *Id.* at 683.

[18] *Id.* at 684.

Following our decision in *Weiss I* the legislature made a number of attempts at settling the class-action litigants' claims,[19] including the creation of the Trust Authority in 1991.[20] The negotiations culminated in the passage of House Bill 201 in 1994,[21] which in essence created the present statutory scheme governing the management and disposal of Trust land.[22] Relevant to our discussion here, HB 201 directed DNR to "establish a separate unit with responsibility for management of the mental health trust land,"[23] which was further instructed to manage Trust land "consistent with the trust principles imposed on the state by the Alaska Mental Health Enabling Act."[24] Secondary to those trust principles, HB 201 required Trust land to be managed "under those provisions of law applicable to other state land" and directed DNR to adopt regulations addressing, *inter alia*, "management for the benefit of the trust."[25] Complying with this directive, DNR created the Land Office and in 1997 promulgated the regulations at issue here.[26]

---

[19] *See Weiss II*, 939 P.2d 380, 384-85 (Alaska 1997).

[20] *Id.* at 385; *see also* ch. 66, §§ 10, 26, SLA 1991.

[21] *Weiss II*, 939 P.2d at 385; *see also* chs. 5-6, FSSLA 1994.

[22] *See Weiss II*, 939 P.2d at 385-86.

[23] AS 44.37.050(a); ch. 5, § 22, FSSLA 1994.

[24] AS 38.05.801(a); ch. 5, § 17, FSSLA 1994.

[25] AS 38.05.801(b)-(c).

[26] *See* Alaska Administrative Code Register 141, at 38-46 (Apr. 1997) (adding chapter 99 to title 11).

Not all of the parties agreed with the proposed settlement, however, and the issue once again ended up before us in *Weiss II*.[27]  One area of disagreement was HB 201's land management provisions; the litigants argued "that the management regime is 'illegal' because it allegedly does not require trust lands to be managed 'solely in the best interest of the beneficiaries.' "[28]  However, recognizing the "express language" in HB 201 requiring "manage[ment] consistent with . . . trust principles," we agreed with the superior court's reasoning "that the settlement's management standard conforms with the requirements of the trust."[29]  We concluded that the superior court did not abuse its discretion when it approved the settlement terms contained in HB 201.[30]  The Land Office's regulations were not addressed in *Weiss II*.

B.      **The Land Office's Decision To Sell The Five Lots In Question To Oliva Was In The Trust's Best Interest.**

The central question in West's appeal is whether the Land Office's best interest decision actually furthered the Trust's best interest.  The applicable agency regulation lays out five "management principles" that the Land Office relies on to determine whether a sale is in the Trust's best interest.[31]  Of particular relevance here is the first principle of "maximization of long-term revenue from trust land."[32]

West argues that the Land Office's decision "did not maximize the return to the Trust" and thus the sale was not in its best interest.  The crux of West's argument

---

[27]     939 P.2d at 386.

[28]     *Id.* at 395.

[29]     *Id.* (quoting AS 38.05.801(a)).

[30]     *Id.* at 402.

[31]     11 AAC 99.020(c).

[32]     11 AAC 99.020(c)(1).

is that he "would have paid more" or "would have offered to purchase all five parcels" if the Land Office had given him the opportunity. As the State points out, however, West's present willingness to increase his offer after-the-fact "is not supported by the record." Throughout the proceedings West only exhibited interest in Lots 17 and 35; indeed, rather than affirmatively increasing his offer or seeking to compete with Oliva, he instead *decreased* his offer and sought "to avoid a bidding war." Although West touts his continued "willingness to negotiate," that does not offer support to his present contention. The Land Office's denial of reconsideration noted that whereas West never increased his offer, Oliva matched West's offer of 30% above fair market value on Lots 17 and 35 and exceeded it by offering 25% above fair market value for three more lots. Furthermore, because Oliva was "only interested in purchasing all five parcels" and the parties were unable to agree on subdivision, selling Lots 17 and 35 to West "would have resulted in additional management costs" for the remaining three lots and "would not have resolved the unauthorized use issues."

West's secondary argument is that the Land Office "le[ft] potential revenue on the table" by not "pursu[ing] the claims for trespass and encroachment on the four other parcels of land." This contention is likewise devoid of support in the record, aside from West's own unsubstantiated allegations. To the contrary, the Land Office was able to negotiate an additional $21,000 settlement for past encroachments, more than double Oliva's initial offer. The Land Office's site visit uncovered no evidence of encroachment on any lots other than Lot 17. Altogether, the total proceeds from the land sale and settlement exceeded the Land Office's estimated projection by $17,150. A review of the whole record reveals ample evidence that supports the best interest decision. It was therefore reasonable for the Land Office to conclude that the sale of five lots to Oliva maximized revenue and was in the Trust's best interest.

## C. West's Remaining Arguments Were Not Raised Below And Are Deemed Waived.

West additionally argues that the Land Office's public notice regulation is inconsistent with the governing statute and is thus invalid. However, West has waived this argument as it is raised here for the first time. Issues that are "inadequately briefed or raised for the first time in a reply brief" on an administrative appeal to the superior court are considered waived.[33] The validity of 11 AAC 99.050 was not one of the nine issues West initially brought for review before the superior court. In his opening brief before the superior court, West never suggested that any of the Land Office's regulations were invalid, nor did he cite any case to provide the applicable legal standard.[34] West first questioned the validity of the agency's regulations in his reply brief, but he again failed to cite any applicable case law in support and at no point did he imply that the public notice regulation was invalid. Nor did West squarely raise the issue at oral argument before the superior court. Instead, the State specifically pointed out that West never alleged the invalidity of any regulation, and West did not contest that characterization on rebuttal. The superior court likewise did not appear to understand West to have been challenging the regulations' validity and only briefly noted the general presumption of validity in passing. West now argues for the first time that 11 AAC 99.050 is an invalid regulation. But this issue has been waived.

West also argues that the Land Office violated its own regulations and a number of other statutes. But none of these issues were raised in his initial comments

---

[33] *Alyeska Pipeline Serv. Co. v. State*, 288 P.3d 736, 743 (Alaska 2012).

[34] Although West argued opaquely that "regulations do not trump statutes," he cited no authority for this proposition and only discussed a legislative audit and some newspaper articles.

to the Land Office.[35] West's remaining arguments are thus waived for failure to initially raise them before the administrative agency.[36] With no other issues properly before us, we affirm.

## V.     CONCLUSION

We AFFIRM the Land Office's best interest decision approving the sale of five lots of Trust land to Oliva.

---

[35]     *See* AS 38.05.035(*l*) (limiting points on appeal to those presented for reconsideration); 11 AAC 99.060(a)-(c) (providing for appeal contingent on request for reconsideration).  West's late comments to the Land Office — which were accepted as a request for reconsideration — focused exclusively on the Trust's best interest and what he described as "[u]nfair business practices."  The present statutory and regulatory issues were not raised until West appealed to the superior court.  West's validity challenge was also not raised in his initial comments, but that failure is potentially excusable as the validity of a regulation falls outside the scope of what an agency has authority to decide. *See* AS 44.62.300(a); AS 44.62.560(e); AS 44.62.570(b).  Regardless, failure to adequately brief an issue before the superior court is fatal.  *See Alyeska Pipeline*, 288 P.3d at 743.

[36]     It is a well-established rule of appellate review that "it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved."  *Walker v. State, Dep't of Corr.*, 421 P.3d 74, 78 (Alaska 2018) (quoting *1000 Friends of Md. v. Browner*, 265 F.3d 216, 227 (4th Cir. 2001)); *accord* 2 AM. JUR. 2D *Administrative Law* § 512 (2014).  Although the superior court addressed each of West's arguments below and the applicability of issue exhaustion was never briefed by the parties, we nonetheless decline to reach issues not adequately preserved.  We reiterate that the superior court is generally not obligated to pass on issues not raised to the administrative agency when acting as an intermediate appellate court.  *See Thoeni v. Consumer Elec. Servs.*, 151 P.3d 1249, 1256-57 (Alaska 2007).