Robert STALNAKER, Administrator of the Public Employees' Retirement System, Appellant and Cross–Appellee,

v.

M.L.D., Appellee and Cross–Appellant.

Nos. S–7289, S–7309.

Supreme Court of Alaska.

June 6, 1997.

Rehearing Denied July 17, 1997.

John B. Gaguine, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellant and Cross–Appellee.

Christine S. Schleuss, Anchorage, for Appellee and Cross–Appellant.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS and FABE, JJ.

*OPINION*

FABE, Justice.

## I. *INTRODUCTION*

Following his termination as the police chief of the City of King Cove, M.L.D. applied for occupational disability benefits under the Public Employees' Retirement System (PERS). Robert Stalnaker, the PERS administrator, denied M.L.D.'s application for occupational benefits, finding that his disability was not occupational within the meaning of the PERS statutes. Stalnaker, however, appointed M.L.D. to nonoccupational disability benefits.

The Public Employees' Retirement Board (PERB) affirmed Stalnaker's decision to deny occupational disability benefits on the alternative ground that M.L.D.'s employment was not terminated "because of" an occupational disability. Stalnaker then suspended M.L.D.'s nonoccupational disability benefits because those benefits also require that the person be terminated "because of" a disability. The PERB affirmed this decision as well.

M.L.D. appealed both decisions of the PERB to the superior court, which affirmed the denial of occupational disability benefits but reversed the PERB's decision to rescind M.L.D.'s nonoccupational disability benefits. Both M.L.D. and Stalnaker appeal.

## II. *FACTS AND PROCEEDINGS*

M.L.D., a former Alaska State Trooper, was hired in December 1988 as the chief of police in King Cove, Alaska. His written employment contract with the City of King Cove (City) ran from January 5, 1989 to June 30, 1991. Under the contract, both parties had the right to voluntarily terminate M.L.D.'s employment upon thirty days' notice. Although M.L.D. received a merit raise at the end of his first year of employment, thereafter he came into conflict with the mayor and City Manager Gary Hennigh over management and policy decisions. M.L.D. had several discussions with both the mayor and the city manager about these problems but was unable to resolve them.

M.L.D. began to suffer depression in mid–1990. This depression worsened during the winter of that year as he experienced difficulties at work and became increasingly isolated. He had difficulty sleeping, ceased seeing friends and attending church, and frequently discussed suicide. At a city council meeting in January 1991, the city council, on the recommendations of the mayor and the city manager, voted not to renew M.L.D.'s employment contract when it expired in June 1991.

On March 5, 1991, M.L.D. traveled to Anchorage with his wife on pre-authorized leave for a dentist appointment. Knowing that his mental condition had worsened, his wife and father-in-law convinced M.L.D. to check into Charter North Hospital (Charter North) for a medical examination with Dr. Wilfred Cassell. After examining M.L.D., Dr. Cassell immediately ordered him hospitalized at Charter North for treatment of severe major depression and suicidal ideation. On March 7, 1991, Dr. Jeanne Bonnar, one of M.L.D.'s doctors at Charter North, determined that M.L.D. was "totally disabled to work in [his] present and previous profession as [a] law officer." Dr. Bonnar predicted that M.L.D. would be disabled and unable to work as a law enforcement officer for at least twelve months.

Although his authorized medical leave of absence expired on March 11, 1991, M.L.D. remained hospitalized at Charter North until March 29, 1991. M.L.D.'s wife testified that she returned to King Cove on March 9, 1991 and advised Police Officer Powell, one of M.L.D.'s subordinates, of M.L.D.'s hospitalization. City Manager Hennigh testified that Officer Powell did not inform him of M.L.D.'s hospitalization.[1] Hennigh testified that he was first notified that M.L.D. was at Charter North during a phone call from the Department of Health and Social Services to verify

---

1. The Board noted that much of Hennigh's testimony about the dates and duration of M.L.D.'s

M.L.D.'s employment.[2] Hennigh testified that he

> took this [information] back to the City attorney, and he said, "The only thing that a prudent person in this position would do would be to exercise the early termination clause in [M.L.D.'s] contract, because whatever is going on with [M.L.D.], we simply can't take the risk of having a police chief that's AWOL on us and that we should just exercise the early termination clause in his contract."

On March 13, 1991, two days after the expiration of the approved medical leave, the City terminated M.L.D. by letter pursuant to the thirty-day notice provision in his contract. While the letter gave no reason for the termination, the City subsequently cited M.L.D.'s failure to notify city officials of his whereabouts after his leave had expired as the reason for his termination.

Following his termination as police chief, M.L.D. applied for occupational disability benefits under PERS. M.L.D. claimed that work-related stress caused him to become permanently disabled by major depression. Robert Stalnaker, the Administrator of PERS, denied M.L.D.'s application, finding that his disability was not "occupational" within the meaning of the applicable PERS statute, AS 39.35.680(26).[3] However, Stalnaker approved M.L.D. for receipt of nonoccupational disability benefits.[4] M.L.D. was informed that his benefits would be subject to annual medical reviews for a determination of continuing eligibility.

M.L.D. appealed the denial of his application for occupational disability benefits to the Board. The Board convened a special meeting on August 25, 1993 to hear and decide M.L.D.'s appeal. After hearing testimony, the Board found that M.L.D. had suffered from varying degrees of depression throughout most of his employment as chief of police in King Cove, including a period of time prior to the work-related stress he cites as the cause of his depression. The Board concluded that M.L.D.'s depression was caused by many factors, including work-related stresses and stresses unrelated to his employment with King Cove. However, the Board did not specifically address whether M.L.D.'s disability was "occupational" under AS 39.35.680(26). Instead, it concluded that M.L.D. failed to establish that he was terminated "because of" a disability as required under AS 39.35.410(a).[5] The Board based its conclusion on findings that M.L.D. was fired due to his unauthorized leave of absence. The Board determined that M.L.D. was therefore not entitled to occupational disability benefits.

After the Board affirmed Stalnaker's denial of occupational benefits, Stalnaker rescinded the award of nonoccupational disability benefits to M.L.D., since this award also requires that employment be terminated "because of" a disability.[6] M.L.D. appealed the

---

absence was inaccurate.

**2.** Hennigh testified that he later received a memorandum from Dr. Cassell informing him that M.L.D. had been hospitalized.

**3.** AS 39.35.680(26) defines "occupational disability" as

> a physical or mental condition that, in the judgment of the administrator, presumably permanently prevents an employee from satisfactorily performing the employee's usual duties for an employer or the duties of another comparable position or job that an employer makes available and for which the employee is qualified by training or education; however, the proximate cause of the condition must be a bodily injury sustained, or a hazard undergone, while in the performance and within the scope of the employee's duties and not the proximate result of the wilful negligence of the employee.

**4.** AS 39.35.680(23) defines "nonoccupational disability" in the same manner as "occupational disability," except that there is no requirement that the proximate cause of the condition be an injury sustained or a hazard undergone while in the performance and within the scope of the employee's duties.

**5** **AS 39.35.410(a) provides:**

> An employee is eligible for an occupational disability benefit if employment is terminated because of a total and apparently permanent occupational disability ... before the employee's normal retirement date.

**6.** AS 39.35.400(a) provides:

> An employee is eligible for a nonoccupational disability benefit if the employee's employment is terminated because of a total and apparently permanent nonoccupational disability ... before the employee's normal retirement date and after five or more years of credited service.

rescission of his nonoccupational disability benefits to the Board. The Board affirmed Stalnaker's action and again concluded that the preponderance of evidence demonstrated that M.L.D.'s employment was terminated under his contract due to an unauthorized leave of absence, and not "because of" a disability.

M.L.D. appealed both of the Board's decisions to the superior court, which consolidated the two appeals. The superior court upheld the denial of M.L.D.'s claim for occupational disability benefits. However, the superior court reversed the rescission of M.L.D.'s appointment to nonoccupational disability benefits, finding that Stalnaker did not have the authority to rescind those benefits eleven months after his initial decision. Both parties appeal.

### III. DISCUSSION [7]

 M.L.D. argues that the Board and the superior court erred by focusing on the City's reasons for firing him rather than on the cause of the termination of his employment. He contends that

[t]he record clearly shows that had M.L.D. returned to work on March 11, 199[1], the City would not have terminated his employment on March 13, 1991. It is undisputed that M.L.D. was absent from work on March 11, 1991, because he was in the hospital. It is undisputed that he was in the hospital to receive treatment for a mental disability. It necessarily follows that he was terminated because of a disability.

The decisions of the Board and the superior court reveal that they assumed that M.L.D. could only be eligible for disability benefits if his disability motivated the City to fire him. In its first decision, the Board found that "[b]ecause [M.L.D.]'s absence ex-

tended beyond his approved leave of absence, Mr. Hennigh indicated that he felt it necessary and that justification existed to exercise the early termination rights under the City's contract with [M.L.D.]." The Board also found that "[t]he reason for [M.L.D.]'s unauthorized absence was not known to the City Manager, and the basis for his termination by the City was his failure to advise of his whereabouts." Based on these findings, the Board concluded that the

preponderance of the evidence in this case demonstrates that [M.L.D]'s employment was not terminated because of a total and apparently permanent occupational disability. Rather, his termination was a consequence of the exercise by the City of King Cove of provisions in his contractual relationship with the City, as further triggered by an unapproved leave of absence.

In its second decision, the Board again concluded that "[M.L.D.]'s termination was as a consequence of the City's notice to him based upon its reading of its contractual rights and obligations, and not because he was suffering from a disability which prevented him from performing his duties." While expressing skepticism about whether M.L.D.'s unapproved absence was the basis for the termination, the superior court also reasoned that the City "did not terminate him because of his disability, and I interpret ["]because of["] to mean that that was the reason for the termination." Instead, the court found that "there were reasons that Mr. Hennig [sic] didn't like, didn't want, whatever, was harassing [M.L.D.], as you pointed out, for a long time. That's why they terminated [him]."

 We agree with M.L.D. that the Board and the superior court should not have focused on the reason the City gives for firing M.L.D. The PERS disability statutes, by re-

---

**7.** This appeal raises both legal and factual issues. When we review a decision of the superior court sitting as an intermediate court of appeal, we give no deference to the superior court's decision. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987). When reviewing administrative decisions, we review questions of law where no agency expertise is involved under a substitution of judgment test. *Municipality of Anchorage, Police & Fire Retire-*

*ment Bd. v. Coffey*, 893 P.2d 722, 726 (Alaska 1995). The factual findings of the administrative agency are reviewed to determine whether, in light of the record as a whole, they are supported by substantial evidence. *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1049 (Alaska 1978). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support [the board's] conclusion."

quiring employment to be "terminated because of a ... disability," call for a broader inquiry into the cause of the termination. AS 39.35.400(a); AS 39.35.410(a). They do not require that the employer's action be motivated by a disability, nor even that the employer, rather than the employee, make the decision to end the employment. *See State, Pub. Employees Retirement Bd. v. Cacioppo,* 813 P.2d 679, 682–83 (Alaska 1991). Therefore, the Board and the superior court erred by basing their decisions on the City's reasons for the termination rather than on the causal relationship between the termination and M.L.D.'s disability.

■ In articulating the analysis required by the statutes, we turn for guidance to the tort law concept of "legal causation." As we stated in *Vincent ex rel. Staton v. Fairbanks Memorial Hospital,* 862 P.2d 847, 851 (Alaska 1993), legal cause encompasses both an actual causation or "but for" prong and a proximate causation or "legal policy" prong. Under the "but for" prong, the "defendant's conduct is a cause of the event if the event would not have occurred but for that conduct." *Id.* (quoting W. Page Keeton *et al., Prosser and Keeton on Torts* § 41, at 266 (5th ed.1984)). Under the legal policy prong, the inquiry focuses on "whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Id.* (quoting *Prosser and Keeton on Torts* § 42, at 273). Applying these principles in the context of PERS disability benefits, the first consideration is whether the termination of the employment would have occurred "but for" the disability. If this initial prong is met, the inquiry should then turn to an evaluation of the significance and importance of the disability's causal role.

■ In this case, M.L.D.'s disability was an actual cause of the termination of his employment. The only reason given by the City for M.L.D.'s termination was his unauthorized leave of absence. M.L.D. did not return to work at the end of his leave because he had been hospitalized for major depression and suicidal ideation. As

M.L.D.'s depression was the only reason for his unauthorized absence, it was a "significant and important" cause of the termination. On March 7, 1991, six days before the City fired M.L.D., one of M.L.D.'s doctors determined that his depression "totally disabled [him] to work in [his] present and previous profession as [a] law officer" and that he would be disabled for at least twelve months. In evaluating M.L.D.'s condition after admission, Dr. Cassell stated that M.L.D. would

> not be able to continue employment in the field of law enforcement, in any capacity, due to Major Depression as a result of his employment conditions in the City of King Cove and the long term care that he must undergo.... [M.L.D.] should be considered totally disabled and is unable to perform his duties as a police officer and will not be able to in the foreseeable future.

Therefore, we conclude as a matter of law that M.L.D.'s termination was "because of" his disability as required by AS 39.35.400(a) and AS 39.35.410(a).

■ Stalnaker asserts that M.L.D. "waived his right to argue that he was terminated because of a disability." Stalnaker bases this argument on the Board's finding in its first decision that M.L.D.'s "counsel declined to argue that a disability per se was the basis for [the] termination action." This argument fails to distinguish between the cause of the termination and the City's reasons for firing M.L.D. M.L.D. vigorously argued before the Board that his termination was caused by a disability.[8]

■ Stalnaker also contends that M.L.D.'s failure "to make sure that Hennigh was aware of the alleged reason why M.L.D. did not return to work as scheduled" was a "superseding cause" that broke "the chain of events arising from his alleged disability." He argues that "it was this failure that caused Hennigh to terminate M.L.D.'s contract, and not M.L.D.'s absence." This argument, however, assumes that the City's motive for firing M.L.D. is the dispositive issue in this case. As discussed above, the proper

---

8. Because the question before the Board was whether M.L.D. qualified for occupational disability benefits, the bulk of the first hearing involved the link between M.L.D.'s employment difficulties and his depression rather than the cause of M.L.D.'s termination.

focus is not whether the City's reason for firing M.L.D. was his unauthorized absence, his disability, or his failure to notify the City of his whereabouts, but the causal role the disability played in the termination.

 Finally, Stalnaker suggests that PERS disability cases, like employment discrimination cases, should focus on the employer's motive for terminating the employee. He argues that "the PERS administrator and the [Board] have the authority to look behind the stated reason for a termination to see if it is a pretext, and if the employee was actually terminated because of a disability." This approach, however, is inappropriate in the context of PERS disability benefits. Antidiscrimination statutes are designed to prevent employers from firing employees for improper reasons. *See, e.g.,* AS 18.80.220(a)(1). Thus, the employer's motive in terminating the employee is a central issue in discrimination claims. *See French v. Jadon, Inc.,* 911 P.2d 20, 24–25 (Alaska 1996). The statutes establishing PERS disability benefits, however, are not intended to prevent employers from firing individuals because of their disabilities. Rather, they are designed to compensate PERS members who, unlike the individuals protected by antidiscrimination statutes, are no longer able to perform their jobs. Thus the emphasis in a PERS disability claim should not be the employer's motive in terminating an employee, but whether the termination was caused by a disability.[9]

9. Stalnaker argues in the alternative that M.L.D.'s employment was terminated on January 29, 1991, the date on which the King Cove City Council decided not to renew his employment contract. He asserts that, because M.L.D. was not disabled at that time, the "termination" could not have been caused by his disability. The word "termination," however, generally "refers to an ending, usually before the end of the anticipated term of the ... contract." *Black's Law Dictionary* 1471 (6th ed.1990). Stalnaker acknowledges that, under the city council's decision, M.L.D. was to have remained in his position as police chief and hence PERS member until his contract expired on June 30, 1991. Therefore, we hold that the Board correctly determined that the termination of M.L.D.'s employment occurred when the City bought out

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's decision that M.L.D. is entitled at a minimum to nonoccupational benefits.[10] We REVERSE the superior court's affirmance of the Board's denial of M.L.D.'s application for occupational disability benefits and REMAND this matter to the Board for a determination of whether M.L.D.'s disability was occupational or nonoccupational.[11]

EASTAUGH, J., not participating.

M.L.D.'s contract after he had been admitted to the hospital in March.

10. Because we base our holding on the alternative ground that the Board erred in its determination that M.L.D.'s employment was not terminated because of his disability, we do not address the superior court's ruling that Stalnaker lacked the authority to rescind the award of nonoccupational benefits to M.L.D.

11. M.L.D. asks this court to hold as a matter of law that he was terminated because of an occupational disability. However, in considering M.L.D.'s first appeal, the Board specifically declined to rule on whether M.L.D.'s disability was occupational or nonoccupational. We therefore remand this issue to the Board.