Kristi RHINES, Appellant,

v.

STATE of Alaska, Public Employees'
Retirement Board, Appellee.

No. S–9475.

Supreme Court of Alaska.

Sept. 21, 2001.

William J. Soule, Law Office of William J. Soule, Anchorage, for Appellant.

Kathleen Strasbaugh, Assistant Attorney General, Juneau, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Kristi Rhines appeals the denial of her claim for occupational disability benefits under the Public Employees' Retirement System. Rhines worked as an administrative assistant for the University of Alaska Fairbanks and claims that she developed tendinitis and other injuries as a result of her extensive use of a computer keyboard and mouse. The superior court upheld the Public Employees' Retirement Board's decision to deny benefits based on the board's findings (1) that the university had not terminated Rhines as a result of her injuries, and (2) that even if she had been terminated, those injuries did not amount to a permanent disability as required by the statute. Because the decision of the administrative board was both within the law and supported by substantial evidence, we affirm the superior court.

## II. FACTS AND PROCEEDINGS

### A. Facts

Kristi Rhines began working for the University of Alaska Fairbanks (UAF) on October 22, 1990. Rhines worked as an Administrative Assistant III with the school's Cooperative Extension Service.

On February 8, 1993, Rhines filed a report of occupational injury in which she complained of numbness and pain in her hands and wrists caused by computer use. Rhines contends that the injuries became so extreme that she was no longer able to work by the middle of March. Rhines did not return to work after March 16, 1993. Neither party argues in this appeal that Rhines's injuries were not suffered as a result of her work at UAF.

Rhines sought medical treatment for her injuries. Dr. Cammack and Dr. Pierson each concluded that Rhines would not be able to work because of her injuries for short periods beginning in March 1993. The doctors wrote several notes excusing Rhines from work for one to three weeks at a time.

In May 1993 Rhines received a letter from Charles Hartman, her supervisor, informing her that the department was undergoing a reorganization that would result in the elimination of her position. Specifically, the department was upgrading two administrative assistants to the position of "fiscal officer." The state claims that this reorganization was motivated by Hartman's retirement and the desire to divide his previous responsibilities between two fiscal officers. Rhines was invited to apply for the fiscal officer position that would result from the elimination of her position. The new position involved more responsibility and higher pay. Rhines applied for the fiscal officer position in June of 1993, but was not selected for the job. Rhines was informed that due to the elimination of her current position she would be laid off on July 30, 1993.

Following her termination, Rhines continued to seek medical help. She repeatedly saw Dr. Lindig, an orthopedist, for treatment. From December 17, 1993, through June 26, 1995, Dr. Lindig's reports consistently stated that Rhines was not able to return to work. Dr. Lindig first noted that Rhines's injury was permanent on June 26, 1995, but thereafter indicated that her injury status was "undetermined" until April 17, 1996, when he again indicated that her injury was "permanent."

In August 1995 Rhines went back to work as an accountant for the Tanana Chiefs. Notwithstanding maternity leave from the middle of September to November of 1995 and absence because of injury from December 1995 to May 1996, Rhines worked for the Tanana Chiefs at least until the time of the board's first hearing in October of 1996. Rhines did claim that an aggravation of her injuries prevented her from performing her duties in this new position after she was asked to fill in for an absent employee whose work involved use of a computer keyboard and mouse.

### B. Proceedings

Rhines applied for occupational disability benefits through the Public Employees' Retirement System (PERS) in July 1993. In that application, Rhines claimed that she was unable to use her hands and arms as a result of intensive use of a computer and a calculator.

Dr. Franklin, medical consultant to the administrator of PERS reviewed Rhines's application and supporting evidence. In a memorandum to the administrator dated December 16, 1993, Dr. Franklin recommended against granting Rhines's application. Dr. Franklin reviewed the findings of six physicians who had seen Rhines and concluded that physicians' reports "clearly do not support a disabling condition." The PERS administrator denied Rhines's application on December 28, 1993 finding "[n]o evidence of a permanently disabling condition." Rhines filed a timely appeal of the administrator's decision on February 3, 1994.

Rhines's claim for occupational disability was heard by the Public Employees' Retirement Board in October of 1996. At the hearing, the board ruled that Rhines had not been terminated as a result of her disability, and even if she had been, she was not permanently disabled. The board issued a written decision to the same effect on November 12, 1996. Rhines appealed the board's decision to the superior court.

While the appeal before the superior court was pending, we decided *Stalnaker v.*

*M.L.D.*[1] in which we set out the criteria for determining whether a PERS claimant was terminated because of a claimed disability. Accordingly, the superior court remanded Rhines's case with instructions that the board apply the *M.L.D.* standards in reaching its decision.

On remand, the board reconsidered the evidence as well as Rhines's re-argument in light of the *M.L.D.* decision. The board concluded that *M.L.D.* was distinguishable and therefore did not affect its decision in this case. It incorporated its findings from the previous hearing and denied occupational benefits once again. The board issued its second written decision on November 6, 1998.

Rhines appealed this second decision of the board to the superior court. This time the superior court affirmed the decision of the board.

Rhines appeals.

## III. STANDARD OF REVIEW

■ When the superior court acts as an intermediate court of appeal in an administrative matter, we independently review the merits of the board's decision.[2]

■ Factual findings made by the board are reviewed under the "substantial evidence" standard.[3] Factual findings will be upheld so long as there is enough relevant evidence to allow a reasonable mind to adequately support such a conclusion.[4] To the extent that the board's decision rests upon interpretation of statutory language, such decisions involve questions of law to which we apply our independent judgment.[5] We will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[6]

■ The state argues that because the board has "developed [a] body of case law" in adjudicating previous appeals, its interpretive decisions merit the deference of a "rea-

sonable basis" standard of review. However, such deference is owing only where the agency's expertise is involved or where the agency has made a fundamental policy decision.[7] Since the board has not shown that such expertise or policy decision exists with regard to the interpretive questions in this case, we decline to apply the deferential "reasonable basis" standard here.

## IV. DISCUSSION

Public officers and employees of the State of Alaska are eligible for occupational disability benefits under the provisions of AS 39.35.410(a). That statute provides:

> An employee is eligible for an occupational disability benefit if employment is terminated because of a total and apparently permanent occupational disability, as defined in AS 39.35.680, before the employee's normal retirement date.

In this case, the decision of the board to deny occupational disability benefits to Rhines was based upon two findings: (1) Rhines was not terminated because of her disability, and (2) Rhines's injuries were not serious enough to qualify as a total and permanent occupational disability.

### A. The Board Properly Rejected Rhines's Claim Because She Was Not Terminated Because of Her Disability.

The board found that Rhines's employment "terminated" when her position was eliminated at the end of July 1993. The state argues that the termination would have occurred whether or not she was disabled because it resulted from reorganizing the department and eliminating Rhines's position.

Rhines argues that she is entitled to benefits because her employment is properly understood as terminating in March 1993. Relying on *M.L.D.*, she argues that the basis for awarding benefits should be her condition

1. 939 P.2d 407 (Alaska 1997).

2. *See DeYonge v. NANA/Marriott,* 1 P.3d 90, 94 (Alaska 2000).

3. *Id.*

4. *See id.*

5. *See Berger v. Wien Air Alaska,* 995 P.2d 240, 242 (Alaska 2000).

6. *Id.*

7. *See Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987).

rather than the status of her job. Since Rhines's condition would not permit her to return to work after March 16, 1993, she concludes that March is the relevant date of termination, and subsequent events not related to her disability should not defeat her claim.

The statute specifies that benefits are only available "if *employment is terminated because of* a ... disability."[8] We addressed that specific requirement in *M.L.D.* There, a police officer was terminated from employment after he failed to return from an authorized medical leave of absence. M.L.D. claimed that he failed to return due to the severe depression that had led him to take the leave of absence in the first place.[9]

We found that M.L.D.'s disability did cause termination of his employment because it was his disability which prevented him from returning. His failure to return to work was the event that triggered his termination. We noted that it was improper for the board to focus on whether the employer knew of or was motivated by the disability, because even according to the employer's explanation of the termination, it was still *caused by* the disability.[10] A finding of causation did not require that the employer be motivated by the disability when deciding to terminate, as might be required in an employment discrimination case.[11]

■ Rather than simply considering the employer's motivation, the question of causation under the PERS statute requires "a broader inquiry into the cause of the termination."[12] We applied the tort law concept of "legal causation" to the question at hand, noting:

> [L]egal cause encompasses both an actual causation or "but for" prong and a proximate causation or "legal policy" prong. Under the "but for" prong, the defendant's conduct is a cause of the event if the event

would not have occurred but for that conduct. Under the legal policy prong, the inquiry focuses on whether the conduct has been so significant and important a cause that the defendant should be legally responsible.[13]

Therefore, with regard to a PERS claim, the first question is whether the disability is a "but for" cause of termination. If that question is answered in the affirmative, then the court considers the significance and importance of the disability's causal role. Before reaching that question of causation in this case, however, the court must resolve a dispute between the parties as to when Rhines was "terminated."

1. *Rhines was terminated when her position was eliminated in July 1993.*

The board treats the reorganization in July 1993 as the point of termination, while Rhines argues that the termination actually occurred on or about March 16, 1993. The statute does not define "terminated." Rhines relies on a definition of "terminated" from Black's Law Dictionary noted by this court in *M.L.D.*—"an ending, usually before the end of the anticipated term of the ... contract."[14] Yet, Black's also contains a definition for "termination of employment," which it defines as "a complete severance of relationship of employer and employee."[15]

■ We conclude that the definition of "termination of employment," requiring a "complete severance" between employer and employee, is the standard to be applied in employment cases. This conclusion is consistent with our decision in *M.L.D.*, because in that case there was a complete severance of the employment relationship when the city sent a letter to M.L.D. informing him that he was terminated three months prior to the expiration of his contract.

**8.** AS 39.35.410(a) (emphasis added).

**9.** *See M.L.D.*, 939 P.2d 407, 410 (Alaska 1997).

**10.** *See id.* at 411–12.

**11.** *See id.* at 413.

**12.** *Id.* at 412.

**13.** *Id.* (citations and internal quotation marks omitted).

**14.** *Id.* at 413 n. 9 (quoting *Black's Law Dictionary* 1471 (6th ed.1990)).

**15.** *Black's Law Dictionary* 1471 (6th ed.1990).

Black's definition of "terminated" used in *M.L.D.* begins with the qualifying statement, "[w]ith respect to a lease or contract." [16] Such a definition was relevant in *M.L.D.* to point out that despite the contractual end date, the employment relationship did not continue after the city terminated his employment. However, that definition is not as useful as the definition of "termination of employment" because it is inapplicable to situations, like the one here, where there is no employment contract for a specified period of time. The definition of "termination of employment" is equally applicable to employment situations whether or not they are governed by contract.

■ Rhines's employment is properly understood as terminating when she was laid off at the end of July 1993. Rhines's injuries in March 1993 did not cut off ties with her employer. Subsequent to her injury she requested a leave of absence, called the office on several occasions to talk to the office manager, and applied and interviewed for the fiscal officer job in order to "hold the position open" for her. The events after Rhines's injury do not show a "complete severance" or an "end" of the relationship between Rhines and UAF.

Rhines goes on to argue that even though she might have been actually terminated for reasons other than her disability, the statute is intended to provide benefits for those who suffer the sort of disability that leads to termination of employment. She suggests that the actual reason for termination is irrelevant because her disability was the sort that would lead to termination eventually and was thus deserving of disability benefits.

In part, Rhines relies upon two cases, *Estate of Ensley v. Anglo Alaska Construction, Inc.*[17] and *State Public Employees Retirement Board v. Cacioppo*,[18] to support her argument that events occurring subsequent to injury do not defeat benefits coverage.

In *Ensley*, the claimant's workers' compensation payments for a work-related back injury were discontinued because he was subsequently stricken with non-work-related cancer.[19] We held that it was error not to consider whether the back injury constituted a disability regardless of the cancer.[20] Similarly, in *Cacioppo*, we held that a firefighter could recover occupational disability benefits even though his injury was arguably caused by both occupational and non-occupational injuries.[21]

However, those cases are not relevant here for two reasons. First, each of them considers what caused the injury rather than what caused termination of employment. Specifically, they analyzed whether the claimed injuries were work-related or occupational despite subsequent events or additional injuries. The question whether Rhines's injury is occupational is not relevant to this appeal: There is no question that the injury is occupational. The issue is whether Rhines was terminated because of her injury. Second, the cases cited by Rhines discuss the proximate cause question of whether the work-related injuries were significant enough to merit some award of benefits. We instructed that the initial work-related injury should be considered when it is one of several causes of the disability.[22] However, Rhines has not shown that her disability was one of the several actual causes of her termination. Until she establishes actual causation, these cases are not relevant.

■ Rhines contends that since her injuries amounted to an occupational disability, she should collect whether or not those injuries actually led to her termination. Yet the same argument could be raised by almost everyone who satisfies the injury requirement of AS 39.35.680(26). Anyone who has a condition that "presumably permanently prevents an employee from satisfactorily performing the employee's usual duties for an

16. *Id.*

17. 773 P.2d 955 (Alaska 1989).

18. 813 P.2d 679 (Alaska 1991).

19. *Ensley*, 773 P.2d at 956.

20. *Id.* at 958.

21. *Cacioppo*, 813 P.2d at 683.

22. *Id.* at 683.

employer or the duties of another comparable position"[23] will almost certainly be prevented from continuing work as a result. Rhines's argument would effectively read the "if employment is terminated because of" language out of the statute and make the only requirement the existence of a total and permanent disability.[24] Such a reading would run against the plain language of the statute as well as previous decisions of this court applying the requirement that termination occur "because of" the disability.[25] In addition, this would violate the maxim that "all sections of an act are to be construed together so that all have meaning."[26]

We conclude that Rhines was terminated when her employer made a clear statement that the employment relationship was discontinued. Therefore, the examination of "legal causation" must focus on Rhines's termination as a result of the department's reorganization in July 1993.

### 2. *Rhines's disability was not an actual cause of her termination.*

The state contends that Rhines was terminated because of an office reorganization that would have occurred irrespective of Rhines's disability. Rhines argues that this court should reject the state's actual causation argument based on her reading of *M.L.D.*

In Rhines's view, in *M.L.D.* we rejected an argument similar to the one raised here by the state—that "but for" causation did not exist because the claimant would have been fired anyway when his contract expired. In *M.L.D.*, however, termination occurred months before the contract actually expired. The employer chose to terminate while the contract was still in effect.[27] Had the employer simply allowed the contract to expire as a way of terminating M.L.D.'s employment, then that case would be closer to Rhines's case. But it did not. Therefore, Rhines's reliance on *M.L.D.* is misplaced.

As noted previously, termination occurred in this case when a department reorganization eliminated Rhines's position in July 1993. Since Rhines has not shown that the reorganization was caused by her disability,[28] she has not established actual causation.

### 3. *Rhines's disability was not a proximate cause of her termination.*

Our finding with regard to actual causation is determinative of the issue of proximate causation. Since we uphold the board's finding that the reorganization was the cause of Rhines's termination, then the disability was not a factor at all. Since proximate cause is relevant only when actual cause has been shown, we need not consider the issue.

Since Rhines's disability is neither an actual nor proximate cause of her termination, we

23. AS 39.35.680(26).

24. Rhines contends that reading the statute otherwise would lead to absurd results. For instance, she argues that under such a rationale an employee who undoubtedly suffers a permanent disability on the job would be denied occupational disability benefits if UAF burned to the ground the next day. Under the plain meaning of the statute, Rhines's conclusion is correct; employees with claims for occupational disability may be denied benefits if the employer terminates them for unrelated reasons like downsizing, reorganization, or even natural disaster. Rhines argues that permitting such nonsensical results will motivate employers to concoct unrelated reasons for termination to defeat the occupational disability claims of deserving claimants.

But the language of the statute is fairly clear. "Where a statute's meaning appears clear and unambiguous, ... the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent." *University of Alaska v. Tumeo*, 933 P.2d 1147,

1152 (Alaska 1997). But Rhines has not argued that legislative history dictates a different outcome.

25. *See, e.g., M.L.D.*, 939 P.2d 407, 411–12 (Alaska 1997).

26. *Hendren v. State, Dep't of Revenue, Child Support Enforcement Div.*, 957 P.2d 1350, 1352 (Alaska 1998).

27. *M.L.D.*, 939 P.2d at 410.

28. Although the facts of this case might lend themselves to the argument, Rhines has not challenged her employer's decision to reorganize as merely a pretext for the actual motivation to get rid of her because of her disability. During the first hearing before the board, Rhines's attorney made clear that Rhines was not accusing UAF of getting rid of her because she was disabled, and Rhines has not raised that argument before this court.

affirm the board's finding that she is not eligible for occupational disability benefits.

B. *Substantial Evidence Supports the Board's Finding that Rhines's Injuries Did Not Amount to an Occupational Disability.*

■ In addition to ruling that Rhines's termination was not caused by her disability, the board also ruled that her injuries were not sufficient to qualify as an occupational disability as defined in AS 39.35.680(26). That definition provides:

"occupational disability" means a physical or mental condition that, in the judgment of the administrator, presumably permanently prevents an employee from satisfactorily performing the employee's usual duties for an employer or the duties of another comparable position or job that an employer makes available and for which the employee is qualified by training or education; however, the proximate cause of the condition must be a bodily injury sustained, or a hazard undergone, while in the performance and within the scope of the employee's duties and not the proximate result of the wilful negligence of the employee[.]

The employee has the burden of proving that the requirements of the statute have been met.[29] The board found that Rhines did not meet her burden of showing that she was presumably permanently disabled from performing her work.

1. *Rhines failed to prove that her injuries are permanent.*

■ The evidence showed that Rhines suffered from tendinitis but did not convincingly show that she suffered from carpal tunnel syndrome or other serious nerve damage. The board relied upon the opinions of seven physicians. All seven agreed that Rhines suffered from tendinitis, otherwise known as bursitis.[30] Five of the physicians concluded that Rhines did not suffer from carpal tunnel syndrome or a condition involving severe nerve entrapment, while the other two doctors did not exclude the possibility of carpal tunnel syndrome. Only one doctor, Dr. Lindig, expressed an opinion that these injuries were permanent.

The board concluded that tendinitis was not a presumably permanent condition that would leave Rhines unable to work. At the board's first hearing, Dr. Cole, a reviewing physician, testified that tendinitis is generally not a permanent condition. The board also pointed to Rhines's apparent ability to work subsequent to her injuries. This was evidenced by her application for the fiscal officer position, her work for Tanana Chiefs, and a list of necessary accommodations composed by Rhines and her doctors.

Rhines's complaints about the board's decision are best summarized in two general arguments. First, Rhines argues that the opinion of Dr. Cole, a reviewing physician who never examined Rhines, should be disregarded. In addition, Rhines feels that the opinions of several of the other physicians should be discounted because the physicians either were not experts or reached their conclusions under false assumptions. Second, Rhines argues that it was improper for the board to treat her attempts to find new employment as evidence of her ability to work. Rhines argues that such a rule would encourage laziness and dissuade disabled workers from pursuing any job that they might be able to perform.

■ Rhines relies upon this court's holding in *Black v. Universal Services, Inc.*[31] for the proposition that the opinion of a reviewing doctor should be discounted. In *Black*, we found that an agency decision was not based on "substantial evidence" where the

---

29. *See Stalnaker v. Williams*, 960 P.2d 590, 594 (Alaska 1998); *Cacioppo*, 813 P.2d 679, 682–83 (Alaska 1991).

30. Although the two terms have technically differing meanings, as bursitis refers to chronic inflamation of a bursa and tendinitis refers to inflamation of a tendon and the lining of the tendon sheath, the two terms "may be used interchangeably to describe the same process, since bursae are often located near tendons." *The Merck Manual of Diagnosis and Therapy* 1367 (Robert Berkow, M.D. et al. eds., 16th ed.1992). The physicians in this case used the terms interchangeably.

31. 627 P.2d 1073 (Alaska 1981).

agency relied upon the opinion of a single doctor who only examined the patient for twenty minutes when that opinion was contrary to the opinion of numerous doctors who had seen the patient repeatedly.[32]

However, our decisions following *Black* clarified its holding. We have held that the opinions of reviewing physicians may constitute substantial evidence when they are consistent with other evidence presented.[33] The current case can be distinguished from *Black* on that basis. Whereas the board in *Black* improperly relied upon the opinion of a single non-treating physician against contradictory evidence, in this case Dr. Cole relied upon a diagnosis of tendinitis and rejection of carpal tunnel syndrome reached by several other physicians.

▮ Rhines also complains that the opinions of other doctors should be disregarded because they either were not specialists or misunderstood the reasons for Rhines's termination. However, Rhines does not adequately support these arguments. Although the opinion of a specialist may deserve more weight, Rhines presents no evidence why the opinion of other physicians should be discredited. Similarly, Rhines fails to explain how a misunderstanding with regard to the reasons for termination would lead a physician to misdiagnose Rhines's injuries.

▮ Rhines complains that most of the evaluations upon which the board relies were conducted within the first year, whereas Dr. Lindig continually monitored Rhines's progress for several years and eventually came to the conclusion that her condition was permanent. However, we do not reweigh the evidence under the "substantial evidence" standard; instead, we only determine if such evidence exists.[34]

Because (1) Rhines has the burden on this issue and (2) the board's finding need only be supported by "substantial evidence," the board's decision is subject to a very minimal standard of review. There need only be substantial evidence to allow a reasonable mind to conclude that Rhines has not met her burden. Given that Rhines's expert cannot objectively prove that her condition is permanent and that Dr. Cole testified that injuries of this sort generally are not permanent and relied upon the concurring examinations of several other physicians, there is sufficient evidence for the board to reasonably conclude that Rhines has not met her burden.

### 2. Rhines failed to prove that her injuries are sufficiently disabling.

Even if Rhines shows that her condition is permanent, she has not shown that those injuries are disabling to the point that they would prevent her from resuming her former position or a comparable position. Despite his opinion that her injuries were permanent, Dr. Lindig appeared to endorse the idea that Rhines could return to work so long as certain accommodations were made. Rhines did not provide evidence to show that any position to which she could return with these accommodations would not be a "comparable position" available with UAF.

There was substantial evidence permitting the board to find that Rhines had not met her burden of proving that she was permanently injured and would not be able to return to work.

Rhines does raise a valid concern with regard to the board's treatment of her continuing efforts to find employment. Claimants in Rhines's situation should not be dissuaded from returning to work if they are able. The fact that Rhines applied for the fiscal officer position after being invited to do so by her supervisor shows very little about the nature of her injuries. Under the circumstances, she could not be expected to forego any chance of returning to her job if she was at all uncertain about whether her injuries would be permanent. Similarly, the fact that she has returned to work on its own is insufficient to establish that she is not disabled. The board did not make sufficient

---

32. *See id.* at 1075–76.

33. *See Safeway v. Mackey,* 965 P.2d 22, 29 (Alaska 1998); *Gillispie v. B & B Foodland,* 881 P.2d 1106, 1110 n. 3 (Alaska 1994).

34. *See Municipality of Anchorage, Police and Fire Retirement Bd. v. Coffey,* 893 P.2d 722, 726 (Alaska 1995).

findings with regard to Rhines's position at Tanana Chiefs to establish that her work there was comparable to her previous position. In fact, Rhines testified that her work involved little or no work with a computer, and her attempts to resume working with a computer resulted in a re-aggravation of her injuries.

However, any mistake made in evaluating these facts is harmless error. Rhines has the burden of establishing a *prima facie* case. She has failed to meet this burden, as her own expert even endorsed the idea that she could return to comparable work. The fact that the board may have improperly relied upon her continuing efforts to find employment to conclude that Rhines could work does not help Rhines meet her burden to prove that she could not return to comparable work.

## V. CONCLUSION

The board properly found that Rhines was terminated when the reorganization in July 1993 eliminated her position. In addition, substantial evidence supported the board's finding that Rhines's injuries were not sufficient to qualify as an "occupational disability" as defined in AS 39.35.680. Therefore, we AFFIRM the decision of the superior court to uphold the board's decision that Rhines is not entitled to occupational disability benefits under AS 39.35.410.